Argued March 2, affirmed June 29, 1972

GILLES, *Appellant, v.* REHABILITATION
INSTITUTE OF OREGON ET AL, *Respondents.*

498 P2d 777

*George M. Joseph,* Portland, argued the cause for
appellant. With him on the briefs were Williams,
Skopil, Miller, Beck & Wyllie, Salem.

*David C. Landis,* Portland, argued the cause for respondents. On the brief were Gearin, Hollister & Landis, Portland.

### DENECKE, J.

This is a malpractice action brought by plaintiff to recover damages for injuries which she sustained while undergoing physical therapy. Defendants are the Rehabilitation Institute of Oregon and Miss Weller, an employee of the Institute and attending physical therapist. A verdict was returned for the defendants. Plaintiff appeals upon the ground that there was insufficient evidence of any contributory negligence to permit the issue to go to the jury.

■ As the jury found the disputed facts in defendants' favor, the evidence will be viewed in a light most favorable to the defendants.

■ The plaintiff, Miss Gilles, had been the principal of an elementary school for about 20 years before this incident. She had hip surgery and after hospitalization went to the Rehabilitation Institute for physical therapy prescribed by her orthopedist. For her therapy she was placed on a tilt-table. The table was horizontal when she was placed on it and strapped in place around the pelvis and knees. It was then gradually raised to a vertical position, which automatically put the patient in a standing position. The patient then was unstrapped and allowed to stand. When in this standing position Miss Gilles was between handrails about chest high which extended from the table and could be used for support.

Just prior to the accident the plaintiff was standing or walking. She complained of feeling faint.

The attendant returned her to the tilt-table and started tilting it from vertical to horizontal position and taking other precautions to prevent plaintiff's hip from flexing or bending. Despite this, plaintiff slid downward and her hip flexed, causing her injury.

The defendants charged the plaintiff with contributory negligence in grabbing the handrails on the tilt-table and pulling herself downward and in refusing to release her hold on the bar, which caused her to slump downward.

Plaintiff moved to strike the allegations of contributory negligence upon the ground that there was no evidence that plaintiff grabbed the bar or, if she did, that such conduct caused her hip to flex and if the plaintiff grabbed the bar or refused to release her hand that these were not voluntary acts but reflex actions of a woman who was either unconscious or at least incapable of volition.

There is testimony, particularly that of Miss Brooks, the head nurse, that plaintiff did grab the bar and refused to release it. The more difficult question is whether the jury could infer that this was a volitional act.

There was testimony that plaintiff was "rude," "abrupt," "imperious," and "hostile" to the people attempting to treat her. The inference could be drawn that she was uncooperative.

The defendant Weller testified that about the time plaintiff grabbed the bar, she became rigid, her eyes were fixed, and she appeared to have an episode of petit mal; however, she retained some state of consciousness. On the other hand, the head nurse testified that plaintiff did not exhibit the symptoms of petit mal, which are lapse of memory and motor function.

The head nurse testified plaintiff's arm hooked under the bar, she sagged and her right hip flexed and she became semi-conscious. Miss Brooks described plaintiff's condition as "somewhat hysterical."

The attendant who was helping plaintiff testified she was conscious during this time. When asked to describe her actions, he testified:

"Well, she got kind of panicky. That's about the only thing I could say is that she was very panicky."

We conclude that the jury could infer from the testimony that plaintiff's conduct was volitional, that is, plaintiff's conduct was not completely out of the control of her will.

Affirmed.

TONGUE, J., dissenting.

The evidence in this case is uncontradicted that at the time when plaintiff was re-injured during the course of her treatment by defendants she either had a petit mal attack, as described by the attendants, or "blacked out" in the process of fainting, as she herself testified. Despite that uncontradicted testimony, the majority, based upon testimony that she "retained some state of consciousness," would hold that the issue of contributory negligence was properly submitted to the jury by concluding that "the jury could infer from the testimony that plaintiff's conduct was volitional, that is, plaintiff's conduct was not completely out of the control of her will."

With all due respect, and after reviewing the law, the testimony and the medical books on the subject, it is my opinion that the only rational conclusion that is possible in this case is that if, as appears to be

conceded, the plaintiff either had a petit mal attack or "blacked out" in the process of fainting, she was, in either event, completely lacking in volitional control over her physical conduct even if, at the same time, she may have "retained some state of consciousness."

The majority apparently concedes that in order to constitute negligence the conduct involved must be *voluntary conduct*. See 2 Harper and James, The Law of Torts 901, § 16.1, which goes on (at p 902) to state that:

> "* * * The requirement is not that any particular state of mind must accompany the act, but simply that the act or omission itself be a *conscious manifestation of the actor's will*. Thus, as we shall see, the bodily movement or rest of a man asleep or in a trance will not itself constitute negligence." (Emphasis added)

To the same effect, it has been held by this court that in an automobile accident case a claim that a driver was either negligent or grossly negligent cannot be sustained when "the only reasonable deduction that can be made from the evidence is that the collision was caused by the fainting of the defendant driver," despite "some testimony of a vague and indefinite character" to the contrary. *La Vigne v. La Vigne,* 176 Or 634, 637, 640, 158 P2d 557 (1945). See also *Whelpley v. Frye, Adm'x,* 199 Or 530, 540, 263 P2d 295 (1953); *van der Hout v. Johnson,* 251 Or 435, 438-39, 446 P2d 99 (1968); and Annot., 28 ALR2d 12, 35 (1953).

Plaintiff's testimony in this case was uncontradicted. She testified that after being lifted off the tilt-table to attempt to walk, she became faint, as on previous occasions, and then said "I can't make it, I am going to faint. I am going to black out. Get me on the table, quick."

The table was then in a vertical position and was fitted with a grip bar on each side. These bars were parallel to the floor.

Plaintiff also testified that:

"I was on the floor with my hands gripping the bars, the parallel bars, very tightly, so tightly it was like a death grip, because I was afraid I was going to faint and my knees were going to go down and I thought by gripping tightly I could prevent any—my knees from bending. * * *

"* * * * * *

"And the last I remember, I was standing there by myself on the platform leaning up against the table with Miss Brooks taking the blood pressure and I was clutching something. * * *"

When asked what was her next recollection, plaintiff testified:

"As I started regaining consciousness, I was in terrific pain and I let out some kind of a scream and this was momentary scream and I was regaining consciousness. They had ahold of me under my arms.

"* * * * *

"* * * And were pulling as hard as they could to get me up on the table."

Defendant Hazel Munro, the head physical therapist, testified that several times previously during the same treatment plaintiff said she was going to faint. She also testified that on this occasion, when plaintiff again said that she was going to faint, they got her back to an upright position on the tilt-table and that:

"* * * we were holding her there on the tilt table, getting the straps buckled prior to winding her down, when she had this episode of what appeared to be petit mal. She began to slide towards the right, * * *.

"* * * * *

"* * * Miss Gilles became rigid, her eyes became fixed, and the nurse had some difficulty and I asked what was the matter, on the other side, and the nurse said, 'Her arm is under the bar.'

"* * * * *

"So the hip and the knee bent, and it was approximately thirty-five degrees, and so we wound her down, and as she became level she began to cry hysterically, * * * and I asked her, because this episode appeared to me to be like an episode of petit mal, and I asked her if she had done this before, and she answered, 'Yes, quite frequently,' * * *."

Defendant Munro also testified, however, that:

"She never fully lost consciousness, although her eyes were rigid. She appeared to be hearing, although she wasn't communicating at that stage."

There was no testimony, however, that any of the attendants told plaintiff to do anything during that period. While they had difficulty in freeing her arm they obviously assumed that she was unable to help herself at that time.

The fact that the attendant testified that plaintiff was conscious and "got kind of panicky" is not inconsistent with this testimony. Indeed, the fact that a patient becomes "panicky" either in the course of a petit mal attack or in the course of fainting can hardly support a finding of the "voluntary conduct" necessary to support a conclusion of contributory negligence.

Miss Brooks, the nurse, did not testify directly that plaintiff did not have a petit mal attack. She had never seen any person suffering from a petit mal seizure and testified only, based upon what she had learned in nurses' training, that in a petit mal attack

"the person does not lose consciousness. Has a lapse of memory and motor function" and that plaintiff did not "exhibit any of those signs or symptoms."

In this case, however, the evidence is uncontradicted that plaintiff had a complete lapse of memory of what occurred during the attack and also that during the attack she was in a "rigid state," so as to have no "motor function" whatever.

The most typical symptom of a grand mal attack is a *"sharp tonic contraction of muscles,"* with the result that the patient's eyes become fixed and his body becomes rigid for what may be only a very short period of time. Lawyers Medical Encyclopedia 516.8, § 32.39a (Supp 1971). See also similar description of petit mal attacks in 3A Gordy-Gray, Attorney's Textbook of Medicine § 92.11 (1970).[1] Also, according to 5 Cyclopedia of Medicine, Surgery, Specialties 217 (1971), in describing petit mal seizures:

> "* * * In the milder degrees, consciousness may not be entirely lost; the patient may hear and can understand what is said to him, but be unable to answer. * * *"

On the other hand, if plaintiff did not have a petit mal seizure, but an attack of fainting (syncope), the result would appear to be the same. Thus, as stated in Attorney's Textbook of Medicine, *supra,* § 90.56 on that subject:

> "* * * The depth and duration of unconsciousness vary. The patient may not be completely unaware of his surroundings, may hear people

---

[1] This also disposes of defendant's contention that evidence that during this admitted "attack" plaintiff "flexed her hand and exerted great force," would support the inference that she did so as a volitional act of a person with control of her motor function.

talking or see blurred outlines, but be unable to respond. * * *"

It is thus my opinion that regardless of whether plaintiff's admitted "attack" was a petit mal seizure or a sudden fainting spell, the "only reasonable deduction that can be made from the evidence," despite some "vague and indefinite" suggestions that she "retained some state of consciousness," is that plaintiff had no "volitional control" over her motor functions during that attack. It follows, in my opinion, that defendants were not entitled to have the affirmative defense of contributory negligence submitted to the jury over plaintiff's motion to the contrary.

Under the evidence in this case the jury might have properly found that defendants were not guilty of negligence as a basis for its verdict. In my opinion, however, the decision of the jury on the question of defendant's negligence could well have been prejudiced by the submission to it of the further question of whether plaintiff was guilty of contributory negligence when there was no proper or sufficient evidence to support such a finding.

For these reasons I respectfully dissent.

McAllister, J., joins in this dissent.